UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NATURAL RESOURCES COUNCIL OF MAINE, | ) ) ) | |
| Plaintiff, | ) ) | CV-05-109-B-W |
| v. | ) ) | |
| INTERNATIONAL PAPER COMPANY, | ) ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT INTERNATIONAL PAPER
COMPANY'S MOTION TO DISMISS THE COMPLAINT**

Nearly two decades after International Paper Company applied to the Environmental Protection Agency to renew its pollution discharge permit, the Maine Department of Environmental Protection finally approved it. All the while, under the terms of a 1985 Environmental Protection Agency (EPA) permit, International Paper (IP)'s Jay, Maine paper mill continued to discharge pollutants into the Androscoggin River. Faced with interminable governmental inertia, in 2005, the Natural Resources Council of Maine (NRCM) filed a citizen law suit against IP, claiming that it was discharging without a valid permit and seeking to enjoin and civilly punish it for doing so.[1] This Court grants IP's Motion to Dismiss, because it concludes that NRCM failed to give proper notice of some legal theories, that its request for an injunction is moot, and that, in any event, EPA's 1985 permit remained effective until the Maine Department of Environmental Protection (MDEP) issued the new permit in 2005.

---

[1] The parties to a mild extent seek to hoist themselves on the white charger: NRCM as the defender of the environment and IP as an innocent corporate citizen trapped in a bureaucratic maze. This Court does not view this case in terms of the status of the parties, but as a matter of law.

# I.  FACTUAL BACKGROUND[2]

## A.  The Parties[3]

Headquartered in Augusta, Maine, Plaintiff NRCM is a non-profit membership organization, which has been working to ensure the protection and conservation of Maine's unique natural and environmental resources for more than forty-five years.[4] *Compl.* ¶ 10.  Its membership includes thousands of Maine residents, including persons who rely on the Androscoggin River for recreational, economic, aesthetic, and community benefits.  *Id.*

Headquartered in Stamford, Connecticut, Defendant IP is a New York corporation which owns and operates a paper mill along the Androscoggin River in Jay, Maine.  *Id.* ¶¶ 13, 20.  The Jay mill can produce 2,120 tons of pulp and paper products per day and, in the summer of 2004, discharged on average 5,413 pounds of biochemical oxygen demand (BOD) and 162 pounds of phosphorus into the Androscoggin River daily.  *Id.* ¶ 20.  In addition to its discharge of BOD and phosphorus, the mill discharged on average 13,832 pounds of total suspended solids (TSS) into the river each day in 2004.[5]  *Id.*

## B.  The Clean Water Act, the Permitting Process, and Citizen Suits

Originally enacted in 1948, the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act) was intended to "restore and maintain the chemical,

---

[2] Reciting these facts, this Court assumes as true the well-pleaded allegations in NRCM's Complaint. *Carroll v. Xerox Corp.*, 294 F.3d 231, 241 (1st Cir. 2002); *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995).

[3] This Court commends counsel for the excellence of their representation.  In particular, the legal memoranda on the Motion to Dismiss were articulate, terse, lively, and substantially assisted this Court's task.

[4] The National Resources Defense Council, Inc. was initially a co-plaintiff, but on September 27, 2005 it filed a voluntary dismissal pursuant to FED. R. CIV. P. 41(a)(1)(i).  *Not. of Dis. of Pl. Nat. Res. Def. Coun., Inc.*

[5] BOD, TSS, and phosphorus reduce the level of dissolved oxygen in the Androscoggin River which, in turn, stresses and reduces indigenous fish species, such as brook trout and salmon. *Compl.* ¶ 2. Moreover, discharges of phosphorus contribute to algae blooms which occur every summer in Gulf Island Pond – the section of the Androscoggin River just downstream of the mill.  *Id.*

physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The Clean Water Act (CWA) provides that "the discharge of any pollutant by any person shall be unlawful" unless, among other things, the discharge is made pursuant to and is authorized by a National Pollutant Discharge Elimination System (NPDES) permit.  *Id.* §§ 1311(a), 1342(a).  The CWA defines the term "pollutant" broadly to include "solid waste" and "chemical wastes," *id.* § 1362(6), and forbids "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12).  Based on the allegations in the Complaint and the CWA's statutory definitions, IP would be required to obtain a NPDES permit before making any discharges of BOD, TSS, or phosphorus into the Androscoggin River.

The CWA authorizes the EPA to issue NPDES permits limiting and setting conditions for the discharge of pollutants.  *Id.* §§ 1311, 1342.  Section 402(b) of the Act provides that a state may establish its own permit program, and after receiving EPA's approval, the state may issue NPDES permits.  *Id.* § 1342(b).  On January 12, 2001, EPA approved the state of Maine's NPDES program covering many Maine waters, including the Androscoggin, and MDEP became the permitting authority for IP's discharges.

In addition to providing for enforcement by state agencies and EPA, the CWA allows private parties to enforce its provisions, including the prohibition of unpermitted discharges in § 1311(a), against alleged violators in so-called "citizen suits."  *Id.* § 1365(a)(1), (f).  An aggrieved plaintiff may bring a civil action for specific relief, such as the imposition of compliance measures or civil penalties payable to the United States Treasury, *id.* § 1365(a), and may recover attorney fees.  *Id.* § 1365(d).  At least sixty days prior to filing, the prospective plaintiff must provide notice of its claims to the potential

defendant, EPA, and the state in which the violations allegedly occurred. *Id.* § 1365(b)(1)(A). If a competent state or federal enforcement agency brings a civil enforcement action against the defendant before the citizen-complaint is filed, or an administrative enforcement proceeding prior to the plaintiff's notice of intent letter, the citizen suit is preempted and must be dismissed. *Id.* §§ 1319(g)(6), 1365(b)(1)(B).

### C. 1985 – 2001: IP's NPDES Permitting History

On June 18, 1985, IP applied to EPA to renew its original NPDES permit. *Compl.* ¶ 24. In response, EPA issued a one-year renewal permit to IP (the 1985 permit), which became effective on September 30, 1985 and was due to expire on September 30, 1986. *Id.* ¶¶ 24-25. On April 2, 1986, prior to the expiration of the 1985 permit, IP applied for renewal of the 1985 permit. *Id.* ¶ 25. Pending decision on its 1986 renewal application, IP continued to discharge pollutants according to the terms of its 1985 permit. *Id.*

EPA took no action on IP's 1986 renewal application until May 1, 1992, when it issued a new five-year permit to IP (the 1992 permit). *Id.* On June 8, 1992, IP requested an evidentiary hearing to challenge some terms and conditions in the 1992 permit. *Id.* ¶ 26. Under the regulations then in effect, the Regional Administrator of EPA was required to grant or deny a request for an evidentiary hearing within thirty days of the deadline to file such a request. *Id.* EPA, however, took no action on IP's request until July 14, 2000 – more than eight years later. *Id.* ¶¶ 26-27. While IP awaited a response from EPA, it continued to discharge pollutants according to the 1985 permit.

Receiving no response, IP applied for renewal of the 1992 permit on August 1, 1997.[6] *Id.* ¶ 27.   On July 14, 2000, EPA responded in writing to both IP's hearing request on the 1992 permit and its 1997 renewal application.[7]   *See Def.'s Mot. to Dismiss*, exh. A.   The letter stated, in pertinent part:

> This letter pertains to your request for an evidentiary hearing dated June 5, 1992 regarding the NPDES permit for [IP].   As you know, that request was neither granted nor denied, and [IP] has been subject to the terms and conditions of its previously issued [1985] permit.
>
> . . .
>
> Because more than five years have passed since the May 30, 1992 permit was issued, we believe that the permit has expired and that the associated request for an evidentiary hearing is no longer pending.   To avoid any possible ambiguity on the status of the 1992 permit and the hearing request, we are hereby withdrawing the permit pursuant to 40 C.F.R. § 124.19(d) (65 Fed. Reg. at 30911).[8]
>
> According to our records, [IP] has reapplied for a new permit.   The new NPDES permit will be reissued either by EPA New England or by the Maine Department of Environmental Protection (if the State receives approval of its pending request to assume implementation of the NPDES program).   [IP] will retain full rights to appeal conditions in any such reissued permit.

*Id.*

On January 12, 2001, EPA signed the National Pollutant Discharge Elimination System Memorandum of Agreement Between the State of Maine and the United States

---

[6] NRCM states in its Complaint that the August 1, 1997 renewal application was "three months after the statutory deadline."   *Compl.* ¶ 27.   This Court has not included this statement in its recitation of facts, because it is an assertion of law, not fact.   *Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996); *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 971 (1st Cir. 1993).

[7] NRCM objects to this Court's consideration of the July 14, 2000 EPA letter as well as other documents attached to IP's Motion to Dismiss or referred to in NRCM's Complaint.   This Court, however, has overruled NRCM's objections regarding two of the four documents attached to IP's Motion to Dismiss, including the July 14, 2000 EPA letter.   *See* Section II(B), *infra*.

[8] 40 C.F.R. § 124.19(d) states, in pertinent part:
> The Regional Administrator, at any time prior to the rendering of a decision . . . to grant or deny review of a permit decision, may, upon notification to the Board and any interested parties, withdraw the permit . . . .

Environmental Protection Agency Region 1 (MOA), which officially transferred responsibility for NPDES permitting from EPA to MDEP. *Compl.* ¶ 28; *Def.'s Mot. to Dismiss* at 3. Prior to this delegation, dischargers were required to secure both a NPDES permit from EPA and a state waste water discharge license pursuant to 38 M.R.S.A. §§ 413-571. *Def.'s Mot. to Dismiss* at 3. As a result of delegation, MDEP, not EPA, became responsible for NPDES permitting and it now issues a single combined state and federal discharge permit. *Id.* Permits issued by the state of Maine through MDEP are referred to as Maine Pollutant Discharge Elimination System (MEPDES) permits. *Id.*

### D.  The Notice of Intent to File Suit and the Lawsuit

On May 26, 2005, counsel for NRCM sent IP a "Notice of Intent to File Suit under 33 U.S.C. § 1365(a)(1)," warning IP of NRCM's intention to initiate a lawsuit for IP's allegedly illegal discharge of "pollutants [into] the Androscoggin River from its pulp and paper mill in Jay, Maine . . . without a [NPDES] permit." *Compl.*, att. 1. The letter stated, in pertinent part:

> We represent [NRCM] . . ., and [its] concerned members who look to the Androscoggin River ("River") for recreational, economic, aesthetic, and community value. Pursuant to section 505(b) of the Federal Water Pollution Control Act (the "Clean Water Act" or the "Act"), this letter provides notice of NRCM's . . . intent to file suit against [IP] under section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1), for discharging pollutants to the Androscoggin River from its pulp and paper mill in Jay, Maine ("Jay mill" or the "mill") without a [NPDES] permit.
>
> Discharges from the Jay mill were last permitted in 1985, under a NPDES permit that expired in 1986. [EPA] continued that permit past its expiration date, even though compliance with its terms promoted the continued degradation of the Androscoggin River. Also, on January 12, 2001, when the State of Maine assumed responsibility for NPDES permits governing discharges into Maine waters, even IP's expired permit ceased to be operative. *See* 40 C.F.R. § 122.6(d). Since at least that date, all of the Jay mill's discharges of pollutants to the Androscoggin River have been illegal.

The River is severely degraded as a result of IP's continued, unauthorized discharges. For example, excessive phosphorus discharges from the mill result in algae blooms every summer in Gulf Island Pond, the 14-mile stretch of the River just downstream of the mill. These blooms violate the state's contact recreation standards. Along with excessive discharges from the mill of [BOD] and [TSS], the algae blooms also deplete the River of dissolved oxygen, limiting indigenous fish populations. These conditions violate Maine water quality standards, which require the Androscoggin River (including Gulf Island Pond) to support all species of indigenous fish and to be suitable for contact recreation.

Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), authorizes any affected citizen to commence a civil action against anyone "who is alleged to be in violation of . . . an effluent standard or limitation under this chapter." An "effluent standard or limitation" includes "an unlawful act under subsection (a) of section 1311 of this title." Section 301(a) of the Act, 33 U.S.C. § 1311(a), proscribes, among other things, the discharge of any pollutant from a point source without a NPDES permit. Since at least January 12, 2001, IP has continuously discharged a number of pollutants from its Jay mill, including (but not limited to) BOD, TSS, and phosphorus, from outfalls identified in IP's expired NPDES Permit (No. ME0001937) into the Androscoggin River. Each day of discharge of each pollutant from the Jay mill following expiration of its permit from at least January 12, 2001, to the present is a separate violation of 33 U.S.C. § 1311(a).

If IP's above-described failure to comply with the Clean Water Act is not corrected within 60 days, NRCM . . . plan[s] to file suit in the United States District Court for the District of Maine, under 33 U.S.C. § 1365(a)(1). This lawsuit will seek an order: (1) declaring that IP is in violation of the Clean Water Act, (2) compelling IP to comply with the Clean Water Act by ceasing all discharges to the Androscoggin River until it obtains a valid NPDES permit, (3) assessing civil penalties, and (4) awarding any other appropriate relief as provided under the Act, including attorneys' fees and litigation costs.

*Id.* On July 26, 2005, NRCM filed this suit seeking declaratory and injunctive relief, as well as civil penalties and attorney fees and costs. *See Compl.* at 11-12.

### E. MDEP's Issuance of a Final MEPDES Permit to IP

Draft permits were proposed for IP's Jay mill, including those dated May 18, 1998, May 13, 2005, and July 25, 2005. *Id.* ¶ 29. On September 21, 2005, MDEP issued a final MEPDES permit to IP establishing new terms and conditions for IP's discharge of pollutants into the Androscoggin River. *See Def.'s Rep. Br. in Supp. of Mot. to Dismiss*, exh. A; http://www.maine.gov/dep/blwq/topic/gip/index.htm. On December 16, 2005, however, MDEP moved the Maine Board of Environmental Protection (MBEP) for a procedural order that, among other things, "allows [MDEP] to reconsider the terms of IP's [September 21, 2005] permit in light of recently received waste discharge data, either through a remand to [MDEP], or in the alternative, by allowing [MDEP] time to complete a permit modification proceeding." *Def's Supp. Rep. in Supp. of its Mot. to Dismiss*, att. 1. The letter states, in part:

> At the November 30, 2005 procedural conference, [MDEP] informed the parties that it had received new waste discharge data from IP that had caused it to lose confidence in key terms within IP's permit. This data relates to, among other things, discharges of phosphorus and orthophosphorus during the month of September, 2005. [MDEP] received this data in October, after issuance of IP's permit on September 21. The new data indicates that IP may be able to achieve final discharge limits for phosphorus, orthophosphorus, and perhaps total suspended solids more quickly than anticipated.

> The discharge data for phosphorus and orthophosphorus illustrates the point. IP's recently issued permit contains an immediate limit on total phosphorus discharges of 193 pounds per day. The permit also contains a compliance schedule which contemplates that the [Jay mill] will achieve a final monthly average phosphorus discharge limit of 130 pounds per day not later than 2015. IP's actual phosphorus discharges during September, 2005, ranged between 56 and 100 pounds per day, and averaged 79 pounds per day, all well below even the final limit of 130 pounds per day.

> The orthophosphorus discharge data for September is similarly encouraging. IP's permit contains a monthly average orthophosphorus discharge limit of 44 pounds per day, and the compliance schedule sets a final limit of 22 pounds per day to be achieved not later than 2015. For the month of September, IP's orthophosphorus discharges ranged between

5.1 and 25 pounds per day, with an average daily discharge of 10.1 pounds.   Therefore, the data suggests IP may be able to achieve compliance with its final discharge limits sooner than expected.

Although IP appears to be within reach of final compliance today on the face of this new data, the [Jay mill's] performance during the month of September must be viewed in context to be properly understood.   For instance, [MDEP] needs to assess what role production levels, both at the pulp mill and at individual paper machines, played in the September results.   [MDEP] must also assess to what degree IP has implemented various discharge reduction strategies, examine the effectiveness of each, and evaluate what potential exists for additional reductions from measures not yet implemented.   As part of this process, [MDEP] has already requested additional information from IP regarding phosphorus and orthophosphorus discharge data and production levels during the summer of 2005.

*Id.* at 2-3 (footnotes omitted).  MBEP has not acted on MDEP's request for a procedural order to revisit IP's newly-issued permit.  In the interim, IP's September 21, 2005 permit remains in effect.  *See id.* at 4 (stating that MDEP "does not believe that a stay of any terms within IP's [September 21, 2005] permit is warranted during reconsideration, or pending the outcome of these appeals").

## II.  DISCUSSION

### A.  Federal Rule of Civil Procedure 12(b)(1):  Standards and Standing

Rule 12(b)(1) provides, in part:

Every defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:  (1) lack of jurisdiction over the subject matter . . . ."

FED. R. CIV. P. 12(b)(1).

"'A motion to dismiss an action under Rule 12(b)(1) . . . raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it.'"  *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 8 n.6 (1st Cir. 2005),

*cert. denied*, __U.S.__, 126 S. Ct. 339 (2005) (quoting 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (3d ed. 2004)).  The party invoking the jurisdiction of a federal court carries the burden of proving its existence.  *See Thompson v. Gaskill*, 315 U.S. 442, 446 (1942) ("[I]f a plaintiff's allegations of jurisdictional facts are challenged by the defendant, the plaintiff bears the burden of supporting the allegations by competent proof." (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc.*, 298 U.S. 178, 188-89 (1936))); *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (quoting *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993)).  To meet this burden, the proponent must clearly establish the grounds upon which the court may properly exercise jurisdiction.  "'[I]t is black-letter law that jurisdiction must be apparent from the face of the plaintiffs' pleading.'"[9]  *PCS 2000 LP v. Romulus Telecomms., Inc.*, 148 F.3d 32, 35 (1st Cir. 1998) (quoting *Viqueira v. First Bank*, 140 F.3d 12, 18 (1st Cir. 1998)).

IP argues that there is no subject matter jurisdiction over NRCM's claims for two reasons:  (1) NRCM lacks Article III standing,[10] because this Court cannot redress the harm NRCM alleges; and, (2) NRCM's claims are moot.[11]  *Def.'s Mot. to Dismiss* at 1, 15-16.  IP's first contention invokes the "forward-looking" requirement for citizen suits

---

[9] The First Circuit has established two ways to challenge subject matter jurisdiction under Rule 12(b)(1): (1) a sufficiency or facial challenge; or, (2) an accuracy challenge. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363-64 (1st Cir. 2001).  Here, IP has not controverted the accuracy, as opposed to the sufficiency, of the allegations in NRCM's Complaint and is, therefore, making a sufficiency or facial jurisdictional challenge under Rule 12(b)(1).

[10] The underpinning for the standing requirement is found in Article III, § 2, which imposes a "case-or-controversy" limitation on federal jurisdiction. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).  Article III standing contains three elements: (1) "an injury in fact"; (2) "a causal connection between the injury and the conduct complained of"; and, (3) likelihood that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted); *see also Steir v. Girl Scouts of the USA*, 383 F.3d 7, 14-15 (1st Cir. 2004) (citing *Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 104 (1st Cir. 1995)).  Here, IP focuses on the third element:  redressability. *Def.'s Mot. to Dismiss* at 15.

[11] This Court addresses mootness later in this opinion. *See* Section II(D), *infra*.

under the CWA.  In *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, the Supreme Court wrote that it "can scarcely be doubted" that "a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit" may obtain redress in "a sanction that effectively abates that conduct and prevents its recurrence."  528 U.S. 167, 185-86 (2000); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 59 (1987) ("[T]he harm sought to be addressed by the citizen suit lies in the present or the future, not in the past.").  It is equally well established that a citizen suit under the CWA must be grounded on an ongoing violation. *Laidlaw*, 528 U.S. at 185; *Gwaltney*, 484 U.S. at 59 ("[C]itizens . . . may seek civil penalties only in a suit brought to enjoin or otherwise abate an *ongoing* violation." (emphasis supplied)).  The critical point for determining standing is the date suit was filed.  *Steir*, 383 F.3d at 15 (citing *Mangual v. Rotger-Sabat*, 317 F.3d 45, 58 (1st Cir. 2003)).  Here, when NRCM filed suit, MDEP had not issued a new permit and, taking NRCM's allegations at face value, IP was as of July 26, 2005, discharging pollutants into the Androscoggin River without a valid permit in violation of the CWA.  Facially, NRCM's Complaint stated sufficient facts to establish an ongoing violation of the CWA and thus it met the standing requirement.

IP raises an additional issue on standing.  It points out that NRCM has not claimed that IP was violating the terms of a permit, but rather that it was operating without one.   But, the absence of a permit does not  necessarily affect standing.  *U.S. Pub. Interest Research Group v. Atl. Salmon of Me., LLC*, 339 F.3d 23, 27 (1st Cir. 2003) ("[T]he United States Public Interest Research Group . . . filed suit against the companies in district court to enjoin the discharge of pollutants *without a permit*.  The Clean Water

Act permits such citizen suits and invests the district courts with authority to enjoin violations." (citing 33 U.S.C. § 1365(a)) (emphasis supplied)).

IP proceeds to its next argument:  because the state, now acting for the federal government, was in the process of taking action, the citizen suit was not appropriate. Citing *Gwaltney*, 484 U.S. at 60-61, IP contends that citizen suits are to play an "interstitial," rather than "potentially intrusive" role, and that this Court should defer to the expertise of the government agency charged with the permitting process.  *Def.'s Mot. to Dismiss* at 16.  IP takes *Gwaltney*'s cautionary note too far.  *Gwaltney* prefaced its comment by quoting the Senate Report, which noted that citizen suits are proper only "'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'" 484 U.S. at 60 (quoting S. Rep. No. 92-414 at 64 (1971)).  *Gwaltney* later clarified that the "notice provisions specifically provide that citizen suits are barred only if the Administrator or State has commenced an action '*to require compliance*.'"  *Id.* at 59 n.3 (citing 33 U.S.C. § 1365(b)(1)(B)) (emphasis in original); *see also Laidlaw*, 528 U.S. at 175 ("[C]itizens lack statutory standing under § 505(a) to sue for violations that have ceased by the time the complaint is filed.  The Act also bars a citizen from suing if the EPA or the State has already commenced, and is 'diligently prosecuting,' an enforcement action." (citing *Gwaltney*, 484 U.S. at 56-63 and 33 U.S.C. § 1365(b)(1)(B))).  Of course, if IP were correct, there would be no citizen suit redress under the CWA for agency delays of years or even, as NRCM alleges here, decades.  In view of the alleged history of this permitting process, NRCM was justified in filing a citizen suit under § 505 on the ground that the federal and state agencies had failed and would continue to fail to "exercise their enforcement responsibilities."

Finally, IP argues that because MDEP has now issued a MEPDES permit, NRCM can no longer obtain redress for IP's discharge of pollutants without a permit. *Def.'s Rep. Br. in Supp. of Mot. to Dismiss* at 7. As IP concedes, see *Def.'s Mot. to Dismiss* at 15 n.18, standing in the jurisdictional sense is tested at the time of filing of the complaint. *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 389 (1st Cir. 2000) (citing *Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000)) (noting that "[s]tanding is assessed at the time the action commences"). As of July 26, 2005, MDEP had not issued a final, enforceable MEPDES permit authorizing IP's discharges from the Jay mill into the Androscoggin River. Thus, dismissal based on lack of standing is inappropriate.[12]

### B.  Federal Rule of Civil Procedure 12(b)(6):  Standards and Documents

Rule 12(b)(6) provides, in part:

> Every defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:  . . . (6) failure to state a claim upon which relief can be granted . . . .

FED. R. CIV. P. 12(b)(6).

"In ruling on a motion to dismiss [under Rule 12(b)(6)], a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (citing *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998)). The defendants are entitled to dismissal only if it "'appears to a certainty that the plaintiff would be unable to recover under any set of facts.'" *State St. Bank & Trust Co. v. Denman Tire Corp.*, 240 F.3d 83, 87 (1st Cir. 2001) (quoting *Roma*

---

[12] Upon the issuance of the permit, standing morphed into mootness. *See Becker*, 230 F.3d at 389 (citing *Advanced Mgmt. Tech., Inc.*, 211 F.3d at 636) (mootness concerns whether "a justiciable controversy existed but no longer remains"). *See* Section II(D), *infra*.

*Constr. Co. v. aRusso*, 96 F.3d 566, 569 (1st Cir. 1996)).  Rule 12(b) provides that "[i]f, on a motion asserting the defense numbered (6) . . ., matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  FED. R. CIV. P. 12(b).  Thus, a court may not ordinarily "consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."  *Alternative Energy, Inc.*, 267 F.3d at 33 (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

There is, however, "a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'"  *Id.* (quoting *Watterson*, 987 F.2d at 3-4).  IP attached the following external documents to its Motion to Dismiss:

(1)  a July 14, 2000 letter from EPA to IP;

(2)  the MOA between EPA and MDEP that transferred NPDES permitting authority from EPA to MDEP;

(3)  a July 25, 2005 draft MEPDES permit published by MDEP for public comment; and,

(4)  EPA Guidance interpreting EPA regulations.[13]

---

[13]    When IP filed its motion, it attached a copy of this document, which it asserted provided agency support for its interpretation of 40 C.F.R. § 122.6.  However, after NRCM objected and upon further consideration, at oral argument, IP withdrew its request that the Court consider the EPA Guidance document.
        Although the Court could consider the July 25, 2005 draft MEPDES permit on the same basis as the MOA, its significance has been eclipsed by the September 21, 2005 permit and it is superfluous.
        Also, after IP moved to dismiss, it submitted a letter from MDEP establishing that MDEP issued a MEPDES permit to IP on September 21, 2005.  The permit itself is not before the Court, but the letter confirms that MDEP in fact issued one, a fact not controverted by the parties.  NRCM has presented

14

*See Def.'s Mot. to Dismiss*, exhs. A-D.  NRCM argues that this Court should consider none of these documents, since they were not attached to the Complaint and IP's motion has not been treated as a motion for summary judgment.  *Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss* at 5-7.  Quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996), NRCM states that the "touchstone of the analysis is how *the plaintiff* relies on the document, *i.e.*, whether the document was '*integral to or explicitly relied on* in the complaint.'" *Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss* at 6 (emphasis in NRCM's memorandum).  It contends the four documents may be essential for IP's defense, but not for NRCM's case. *Id.* at 5-7.

### 1.  The July 14, 2000 Letter from EPA to IP

Paragraph 27 of NRCM's Complaint states in part:

> By letter dated July 14, 2000, EPA notified IP that its evidentiary hearing request (submitted in 1992) was "no longer pending" since a 1992 permit, had it been operative, would have expired; that IP was still subject to its 1985 permit; and that any new permit would be issued by EPA or MDEP.

NRCM argues that it did not technically incorporate the contents of the letter and that it does not "endorse the explanation of an EPA apparatchik excusing the agency's eight-year long failure to respond to a request that should have been answered within 30 days."[14]  *Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss* at 6.

---

evidence, also in letter form, that on November 30, 2005, MDEP requested that MBEP reopen the IP permit, because MDEP can no longer stand behind its conditions.  In arriving at its decision, this Court has considered the fact, which the parties acknowledge, that MDEP issued a MEPDES permit to IP on September 21, 2005.  Although the Court has before it a letter that suggests MBEP may revisit the terms of the permit, there is no evidence MBEP has done so.

[14] NRCM may be forgiven a bit of hyperbole here.  In its original meaning, "apparatchik" referred to an agent of the Soviet Communist Party apparatus or political machine.  WEBSTER'S THIRD INTERNATIONAL DICTIONARY 102 (3d ed. 2002).  It has since acquired a secondary meaning of a member of the bureaucracy blindly devoted to his superiors or organization.  *Id.*  In fairness to Linda M. Murphy, Director of the Office of Ecosystem Protection for Region 1 at the EPA, who authored the July 14, 2000 letter, there is no evidence she fits either definition.

NRCM slices too thinly here.  The exception does not require that the document be expressly incorporated in the complaint.  It only requires that the document be "sufficiently referred to in the complaint."  *Alternative Energy, Inc.*, 267 F.3d at 33.  Thus, for example, in *Diva's, Inc. v. City of Bangor*, the First Circuit upheld the district court's consideration of a contract between a bar and the city, which was only referred to in Diva's complaint, but attached in full to the city's motion to dismiss.  411 F.3d 30, 38 (1st Cir. 2005).   Here, the July 14, 2000 letter is "sufficiently referred to in the complaint."[15]  *Alternative Energy, Inc.*, 267 F.3d at 33.

NRCM protests, however, that even if sufficiently referred to, this Court cannot consider the contents of the document, except as used by the plaintiff.  Reference, according to the NRCM, is not reliance.  *Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss* at 6.  In *Shaw*, the First Circuit did not limit consideration of such documents only to the way the plaintiff used them in the complaint.  The rule, as NRCM would have it, would allow a plaintiff to selectively cite a portion of a document to its benefit in framing the allegations in its complaint, but would forbid a defendant from having the court consider the document as a whole.  To the contrary, the *Shaw* court upheld the district court's consideration of the entirety of a document in a securities fraud case.  82 F.3d at 1219-20.  *Shaw* stated that "a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the

---

[15] NRCM cites *Oren v. Verizon Commc'n.*, 224 F.R.D. 527, 529 (D. Me. 2004), for the proposition that courts have routinely refused to consider documents defendants asserted were integral to the complaint.  If this proposition assumes that the complaint made no reference to the document and the defendants' assertions were unjustified, this Court has no quarrel with it.  *Oren* does not, however, support NRCM's overriding point that a court must consider a document referenced in a complaint only in the way and for the purpose the plaintiff references it.  In *Oren*, the complaint stated a wage and hour claim; the defendant based its motion to dismiss on the terms of the earlier settlement agreement, which was not even alluded to in the complaint.  *Id.* at 528-29.  Ruling on a Rule 12(b)(6) motion to dismiss, Judge Carter properly refused to consider such an external document.  *Id.* at 529.

complaint, without converting the motion into one for summary judgment." *Id.* at 1220 (citing *Watterson*, 987 F.2d at 3-4). If the rule were otherwise, the plaintiff could "maintain a claim of fraud by excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning . . . ." *Id.* Here, NRCM later argued that the contents of the July 14, 2000 letter supports its legal position. *Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss* at 15 ("that letter confirms that the 1997 [sic] permit expired in May 1997").

*Shaw* explained that the "main problem of looking to documents outside the complaint - - lack of notice to the plaintiff - - is dissipated 'where the plaintiff has actual notice . . . and has relied upon these documents in framing the complaint[.]'" 82 F.3d at 1220 (quoting *Watterson*, 987 F.2d at 3-4, *in turn quoting*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). Here, NRCM conceded the authenticity of the July 14, 2000 letter at oral argument, had prior notice of the letter, incorporated it in its Complaint, quoted portions of the letter in its Complaint, and argued the letter supports its position. In ruling on the motion to dismiss, this Court will consider the complete contents of the July 14, 2000 EPA letter.

**2. The July 12, 2001 Memorandum of Agreement Between EPA and MDEP**

Similarly, NRCM referred to and described the MOA in the Complaint. *See Compl.* ¶ 28 ("On January 12, 2001, EPA signed the NPDES Maine Agreement, which officially transferred responsibility for NPDES permitting from EPA to MDEP."). It also conceded at oral argument that the MOA is authentic and constitutes a matter of public record. Finally, the MOA is undoubtedly central to NRCM's primary claim against IP, as its date of execution constitutes the point at which NRCM claims IP began discharging

17

pollutants without an operative NPDES permit.   This Court will consider the July 12, 2001 MOA between EPA and MDEP.

### C.  The Citizen Suit Sixty-Day Notice Requirement

IP argues that this Court should not consider certain NRCM arguments because they were not sufficiently noticed in its citizen suit sixty-day notice letter.  *Def.'s Rep. Br. in Supp. of Mot. to Dismiss* at 2-4.  IP does not dispute that NRCM's sixty-day notice covered its claim that IP has discharged pollutants without a NPDES permit since January 12, 2001 – the date on which NPDES permitting authority was delegated to MDEP.  *Id.*  Rather, it contends that NRCM's sixty-day notice failed to properly cover its remaining two claims that:  (1) EPA could not administratively extend a NPDES permit beyond a period of five years – the maximum time period for which EPA may issue new NPDES permits under 33 U.S.C. § 1342(b)(1)(B); and, (2) IP's alleged failure to timely file a renewal application for its 1992 permit in 1997 resulted in a "break in the chain" of administrative extensions.

Before a citizen-plaintiff can initiate a law suit under the CWA, it must provide notice of the alleged violation to EPA, to the state in which the alleged violation occurred, and to the alleged violator, and then wait sixty days before commencing a lawsuit.  33 U.S.C. § 1365(b)(1)(A); *see Massachusetts v. U.S. Veterans Admin.*, 541 F.2d 119, 121 (1st Cir. 1976) ("Because the instant suit was filed prematurely, and has not been cured by a supplemental complaint, it failed to meet the statutory criteria for federal court jurisdiction under § 505(a)." (internal citation omitted)).  The CWA's implementing regulations require that the sixty-day notice include specific information:

> Notice regarding an alleged violation of an effluent standard or limitation
> or of an order with respect thereto, shall include sufficient information to

permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a); *see also* 33 U.S.C. § 1365(b) (requiring that notice "be given in such manner as the Administrator shall prescribe by regulation").

The purpose behind the sixty-day notice provision is to give the alleged violator "an opportunity to bring itself into complete compliance," *Gwaltney*, 484 U.S. at 60, and to allow the agency "to resolve the dispute and take any necessary corrective measures before a resort to the courts . . . ." *Water Keeper Alliance v. U.S. Dep't of Def.*, 271 F.3d 21, 29 (1st Cir. 2001) (addressing the notice requirement in the Endangered Species Act). When addressing the sufficiency of the notice, the First Circuit has instructed that "the notice must adequately inform the agency of the exact grievances against it," if it is to fulfill the purpose underlying the notice provision. *Id.* at 30.

The Supreme Court directed lower federal courts to construe strictly the facial content of sixty-day notices, requiring that citizen-plaintiffs comply with the regulation's specific enumerations. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 33 (1989) (requiring dismissal where the citizen-plaintiffs did not send the sixty-day notice to the appropriate federal and state agencies); *Water Keeper Alliance*, 271 F.3d at 29 ("We have previously read the 60-day notice requirement in environmental statute citizen suits strictly." (citing *Garcia v. Cecos Int'l, Inc.*, 761 F.2d 76, 78-82 (1st Cir. 1985))).[16]

---

[16] In *City of Biddeford v. Me. Energy Recovery Co.*, 323 F. Supp. 2d 111, 113 (D. Me. 2004), Magistrate Judge Cohen expressed a contrary view on the substance of the notice. Judge Cohen concluded that the requirement of strict compliance was directed only to the timing of the notice, not its content. He wrote that the defendant "has not cited any authority to support its assertion that the First Circuit requires strict compliance with 40 C.R.F. § 54.3(b) . . . ." *Id.*

Where, as here, the issue is whether the notice was sufficient, the proper inquiry is whether "'[i]n practical terms, the notice . . . [was] sufficiently specific to inform the alleged violator about what it [was] doing wrong, so that it . . . kn[ew] what corrective actions [would] avert a lawsuit.'" *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 996 (9th Cir. 2000) (quoting *Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997)); *see also Sw. Ctr. For Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir. 1998) (the plaintiff must "provide sufficient information of a violation so that the [recipients] could identify and attempt to abate the violation" (citing *Pub. Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1249 (3d Cir. 1995))).   Circuit courts interpreting the regulations applicable to the CWA's notice provisions have not required plaintiffs to "list every specific aspect or detail of every alleged violation." *Hercules, Inc.*, 50 F.3d at 1248.  "The key language in the notice regulation is the phrase 'sufficient information to permit the recipient to identify' the alleged violations and bring itself into compliance." *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002). Notice is sufficient so long as it "give[s] the accused company the opportunity to correct the problem." *Atl. States Legal Found., Inc.*, 116 F.3d at 820.  In other words, "the Clean Water Act's notice provisions and their enforcing regulations require no more than 'reasonable specificity.'" *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir. 2002) (citing *Catskill Mountains Chapter of Trout Unlimited, Inc. v. New York*, 273 F.3d 481, 488 (2d Cir. 2001)).[17]

---

[17] Although the First Circuit has yet to directly address CWA sixty-day notice sufficiency, the Ninth Circuit has confronted the issue on multiple occasions.  *See, e.g., Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913 (9th Cir. 2004); *San Francisco BayKeeper, Inc.*, 309 F.3d at 1153; *Henry Bosma Dairy*, 305 F.3d

In *ONRC Action v. Columbia Plywood, Inc.*, a case strikingly similar to NRCM's, the Ninth Circuit found a facially compliant sixty-day notice failed the specificity requirement.[18]  286 F.3d 1137, 1144 (9th Cir. 2002).  In *ONRC Action*, the sixty-day notice alerted recipients that "Columbia Plywood had been discharging pollutants into the Klamath River without a valid NPDES permit since November 30, 1989." *Id.* at 1140. The Ninth Circuit noted that "[n]o other defects in the permit, or related to the permit, were specified [in the notice]." *Id.*  The complaint, however, requested relief on three grounds:  (1) failure to apply for a permit renewal more than 180 days prior to the expiration of the permit; (2) lack of power on the part of the permitting authority to administratively extend a permit beyond five years without renewing it; and, (3) failure to reapply for permit renewal five years after the initial renewal application. *Id.*  The court concluded that the notice was valid only with respect to the first claim because "ONRC's 60-day citizen suit notice was not sufficient to alert a reasonable defendant to the two Clean Water Act claims dismissed by the district court," and "Columbia Plywood [should not be] required to speculate as to all possible attacks on its NPDES permit that might be added to a citizen suit when the 60-day notice so specifically identified only one attack based upon timeliness of the renewal application." *Id.* at 1143.  *ONRC Action* was also

---

[18] NRCM urges this Court to adopt Judge Reinhardt's reasoning in dissent. *See ONRC Action*, 286 F.3d at 1144-46 (Reinhardt, J., concurring in part and dissenting in part).  Judge Reinhardt wrote that the Ninth Circuit had not suggested that "the notice must disclose all the legal theories underlying the claim that a violation had occurred.  The legal theories may properly be stated for the first time in the complaint or in response to a motion to dismiss." *Id.* at 1144 (emphasis omitted).  To adopt such a forgiving view would negate the effectiveness of the notice requirement, since the citizen-plaintiff could notify in generalities and plead in specifics, thereby eliminating the purpose underlying the notice requirement.  Assuming there could be a case where a citizen-plaintiff could establish just cause for failing to specify all grounds in its notice, this is not it.  NRCM has made no showing that the legal theories propounded on July 26, 2005 in the Complaint could not have been mentioned on May 26, 2005 in the notice and, as they could have, they should have.

at 943; *ONRC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137 (9th Cir. 2002); *Sw. Marine, Inc.*, 236 F.3d at 985; *Wash. Trout v. McCain Foods, Inc.*, 45 F.3d 1351 (9th Cir. 1995).

rooted in "the effect of the notice on state and federal administrative agencies." *Id.* at

1144.  The court explained:

> An important interconnection exists between the proper exercise of our
> jurisdiction over claims raised in a Clean Water Act citizen suit and the
> role of federal and state agencies in monitoring such suits. *See Hallstrom*,
> 493 U.S. at 29.  Had ONRC's notice specified its other theories, either
> Oregon or the EPA might well have decided that those theories had
> sufficient merit to call for agency action. Were we to exercise jurisdiction
> over such claims when they were not disclosed by the citizen suit notice,
> we would usurp the right of the applicable governmental agencies to
> evaluate and act upon the merits of the claims prior to judicial review.

*Id.*

Like *ONRC Action*, NRCM informed IP that it intended to contest the validity of

IP's permit, and that the solution would be to get a new permit.  *Id.* at 1143; *Compl.*, att.

1.  Like *ONRC Action*, NRCM itemized a particular theory on which the permit was

invalid – here, that delegation of NPDES permitting authority to MDEP caused IP to

violate "the state's contact recreation standards" and "Maine water quality standards."

*ONRC Action*, 286 F.3d at 1143; *Compl.*, att. 1 ("Also, on January 12, 2001, when the

State of Maine assumed responsibility for NPDES permits . . . even IP's expired permit

ceased to be operative.  Since at least that date, all of the Jay mill's discharges . . . have

been illegal." (internal citation omitted)).

Further, the notice must be viewed in context of its potential ramifications.

NRCM's notice demands that the Court impose the statutory remedies of injunction and

civil penalties.  The injunction, if granted, could prohibit IP from discharging any

pollutants into the River, thereby requiring IP to shut the mill down, even if only

temporarily.  The requested civil penalties, as later specified in the Complaint, are

$27,500.00 per day up to March 15, 2004 and $32,500.00 per day from March 15, 2004

onward.  *Compl.* at 11-12 (citing 33 U.S.C. §§ 1319(d), 1365(a)).  In assessing how to respond to the claim of violation during the sixty day waiting period, government agencies and the alleged violator must evaluate the seriousness of the substantive challenge.  Like *ONRC Action*, this Court is concerned that EPA and MDEP were not given adequate notice of the significance of the unasserted NRCM challenges to make the assessment the notice provision contemplates.  As such, this Court's exercise of jurisdiction over claims not disclosed in the notice, "would usurp the right of the applicable governmental agencies to evaluate and act upon the merits of the claims prior to judicial review."  *ONRC Action*, 286 F.3d at 1144.

Turning to the exact language of the notice, this Court concludes that it was insufficient "to alert a reasonable defendant to . . . two Clean Water Act claims," *id.* at 1143, and failed to "include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated . . . ."  40 C.F.R. § 135.3(a).  Even interpreting it in a manner most conducive to NRCM, the notice cannot be construed to contain a fair warning that EPA had acted outside its statutory authority under 33 U.S.C. § 1342(b)(1)(B) by exceeding the five year limit.  The notice states:

> Discharges from the Jay mill were last permitted in 1985, *under a NPDES permit that expired in 1986.  The [EPA] continued that permit past its expiration date*, even though compliance with its terms promoted the continued degradation of the Androscoggin River.  *Also*, on January 12, 2001, when the State of Maine assumed responsibility . . , even IP's expired permit ceased to be operative.  Since *at least* that date, all . . . discharges . . . have been illegal.

*Compl.*, att. 1 (internal citation omitted) (emphasis supplied).  If NRCM intended to convey the message that EPA violated its statutory authority, it could not have done so more obliquely.  IP might intuit from the terms, "expired," "also," and "at least" that

NRCM could be asserting some sort of pre-January 12, 2001 violation. But, although NRCM is clearly critical of the EPA extension, ("even though compliance . . . promoted continued degradation"), the notice does not state that EPA was without authority to continue the permit. For an administrative agency to act unwisely is not by itself to act illegally. Further, the phrases, "even though compliance with its terms promoted continued degradation" and "IP's expired permit ceased to be operative" on January 12, 2001, imply that there was a valid permit with terms to be complied with, which was effective until 2001. Finally, the vagueness in the notice on this issue runs counter to its specificity for the claim it was clearly making.

Regarding NRCM's third claim, there is no intimation in the NRCM notice of any contention that IP had failed to timely file its renewal application in 1997 for the 1992 permit. On that issue, this notice utterly fails to comply with statutory and regulatory requirements as judicially interpreted and constrained.

It might be argued that even if NRCM failed to specify all grounds for IP's violations of the CWA, IP was placed on notice that its EPA permit was invalid and it should act to obtain a new one. *ONRC Action* rejected a similar argument. In *ONRC Action*, the plaintiff argued "that because all of its claims, whether or not they are specified in the 60-day notice, challenge the validity of [the defendant's] permit, and could thus have been abated by [the defendant] obtaining a new permit, the notice was sufficiently specific to inform [the defendant] about what it was doing wrong, so that it knew what corrective action to take." 286 F.3d at 1143. The Ninth Circuit disagreed, concluding that the defendant was "not required to speculate as to all possible attacks on its NPDES permit that might be added to a citizen suit when the 60-day notice so

24

specifically identified only one attack based upon timeliness of the renewal application." *Id.*

The statute, regulation, and case law do not contemplate that recipients should have to parse the language in the notice to understand the citizen-plaintiff's contentions. This Court declines to consider any basis for invalidation of IP's 1985 NPDES permit, other than the effect of the January 12, 2001 delegation of NPDES permitting authority to MDEP.[19, 20]

### D. Mootness in Connection with Claims for Injunctive Relief and Civil Penalties Under the Clean Water Act

IP contends that this Court should dismiss the Complaint on mootness grounds because a final MEPDES permit has now issued. *See Def.'s Rep. Br. in Supp. of Mot. to Dismiss* at 7; *Def.'s Supp. Rep. in Supp. of Mot. to Dismiss* at 3-4. The doctrine of mootness enforces the requirement "that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974) (citing *Roe v. Wade*, 410 U.S. 113, 125 (1973)). Mootness has been described as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S.

---

[19] If EPA's extension were before this Court, it is notable that in 1988, the Natural Resources Defense Council (NRDC) lost a similar challenge before the District of Columbia Circuit Court of Appeals, applying prior Supreme Court precedent. In *Pan-Atl. S.S. Corp. v. Atl. Coast Line R.R. Co.*, the Supreme Court held that the Administrative Procedures Act supplemented the time limit imposed by the Interstate Commerce Act and affirmed the Interstate Commerce Commission's extension of a temporary permit beyond a 180-day statutory limit. 353 U.S. 436 (1957). In 1988, the D.C. Circuit, relying upon *Pan-Atlantic S.S. Corp.*, rejected NRDC's claim (similar to NRCM's claim here) that 40 C.F.R. § 122.6(a), which incorporates by reference 5 U.S.C. § 558(c), violated the CWA. *See Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 213-14 (D.C. Cir. 1988) ("[T]he expired permit is continued, not by affirmative agency action, but by operation of law.").

[20] Similarly, it is questionable whether the chain of administrative extensions of IP's 1985 permit was broken by its 1997 renewal application. Assuming a timely renewal application were necessary, it likely became a nullity when EPA withdrew that permit on July 14, 2000, and informed IP that it had been and would continue to be subject to the terms and conditions in its 1985 permit.

43, 68 n.22 (1997) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980), *in turn quoting*, H.P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 YALE L.J. 1363, 1384 (1973)) (quotation marks omitted). Where post-complaint events render a judicial opinion advisory, Article III considerations demand dismissal. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *Mangual*, 317 F.3d at 60. The burden of establishing mootness rests with the party seeking its application, and "[t]he burden is a heavy one." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). Only where it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" will a case be dismissed as moot. *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968).

### 1. Cases Before *Laidlaw*

The Supreme Court addressed mootness as it pertained to citizen suits for injunctive relief under the CWA in *Gwaltney*, 484 U.S. at 49. In that case, the Court construed the jurisdictional requirements of the citizen suit provision of the CWA as "requir[ing] . . . citizen-plaintiffs [to] allege a state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57. This construction concerned the defendant, which argued that the Court's interpretation would violate the case and controversy requirement of Article III were the defendant to come into compliance during the course of the lawsuit. *Id.* at 66. The Court provided a brief response:

> Longstanding principles of mootness . . . prevent the maintenance of suit when "'there is no reasonable expectation that the wrong will be repeated.'" In seeking to have a case dismissed as moot, however, the defendant's burden "is a heavy one." The defendant must demonstrate that it is "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." Mootness doctrine thus protects

> defendants from the maintenance of suit under the Clean Water Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable "protestations of repentance and reform."

*Id.* at 66-67 (citations omitted) (emphasis in original). *Gwaltney* thus applied the mootness doctrine to CWA citizen suits seeking injunctions. It is less clear, however, whether *Gwaltney* applied to claims for civil penalties under the CWA.[21]

### 2. *Laidlaw*

In *Laidlaw*, the Supreme Court addressed whether a defendant's post-complaint compliance in a CWA citizen suit could moot a citizen-plaintiff's claim for civil penalties. 528 U.S. at 189. The Court noted that "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Id.* (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). It recited language from *Gwaltney*, stating that a defendant's voluntary conduct could moot a plaintiff's "case," but only if the defendant satisfies "the formidable burden of showing that it is absolutely clear [that] the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 190 (citing *Concentrated Phosphate Exp. Ass'n, Inc.*, 393 U.S. at 203). The Court placed additional emphasis on the deterrent effect of civil penalties, opining that a court's "[d]enial of injunctive relief does not necessarily mean . . . there is no prospect of future violations for civil penalties to deter." *Id.* at 193.

---

[21] Following *Gwaltney*, the circuit courts addressed this issue and determined it does not. *Comfort Lake Ass'n v. Dresel Contracting, Inc.*, 138 F.3d 351 (8th Cir. 1998); *Atl. States Legal Found., Inc.*, 116 F.3d at 814; *Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493 (3d Cir. 1993); *Atl. States Legal Found., Inc. v. Pan Am. Tanning Corp.*, 993 F.2d 1017 (2d Cir. 1993); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128 (11th Cir. 1990); *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 696 (4th Cir. 1989). With *Comfort Lake Ass'n*, all six circuit courts to have addressed the issue concluded that a defendant's post-complaint compliance in a CWA citizen suit, though mooting a claim for injunctive relief, would not moot a citizen-plaintiff's claim for civil penalties.

### 3.  Cases After *Laidlaw*

Since *Laidlaw*, there have been three circuit court decisions concluding that, even if subsequent events rendered moot a claim for injunctive relief, a claim for civil penalties could persist under the CWA.  *San Francisco Baykeeper, Inc.*, 309 F.3d at 1153; *Tamaska v. City of Bluff City*, Nos. 00-5179 and 00-5244, 2002 WL 22003 (6th Cir. Jan. 4, 2002) (unpublished opinion); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000).   *Ecological Rights Found.* stated that "liability for civil penalties under the Clean Water Act attaches at the time the violations occur, not at the time of the judgment."  230 F.3d at 1153 (citing 33 U.S.C. § 1319(d)).  Citing *Laidlaw*, the Ninth Circuit added that in this case, civil penalties would serve as a deterrent to future violations.  *Id.*

IP relies heavily on *Mississippi River Revival, Inc. v. City of Minneapolis*, 319 F.3d 1013 (8th Cir. 2003).  In *Mississippi River Revival*, the plaintiffs brought suit against the cities of Minneapolis and St. Paul for allegedly discharging storm waters without CWA permits.  *Id.* at 1014.  Both cities had, however, applied to the Minnesota Pollution Control Agency (MPCA) for permits,[22] but MPCA had failed to act on the permit applications within the one year required by EPA regulation.  *Id.* at 1015.  The necessary permits were issued after the complaints were filed and the district court dismissed the plaintiffs' claims, including the civil penalties claim, as moot.  *See Mississippi River Revival, Inc. v. City of Minneapolis*, 145 F. Supp. 2d 1062, 1067 (D. Minn. 2001), *aff'd*, 319 F.3d 1013 (8th Cir. 2003).  The plaintiffs appealed.

---

[22] The EPA had delegated its NPDES permitting authority to MPCA.  *Mississippi River Revival, Inc.*, 319 F.3d at 1015.

The plaintiffs asserted that their claim for civil penalties was not rendered moot simply because their claim for injunctive relief was no longer viable.  In support, the plaintiffs contended "that civil penalties 'attach irrevocably to a violator at the time of the violation,' and therefore it is 'irrelevant whether, at this time, there is no likelihood that the Cities will commit any future violations.'"  *Mississippi River Revival, Inc.*, 319 F.3d at 1016.  The Eighth Circuit disagreed, concluding that "the Act limits citizen suit plaintiffs to remedies that will redress ongoing and future injury, so the *Laidlaw* mootness standard applies" to claims for civil penalties.[23]  *Id.*

The plaintiffs next argued that the cities had not met their "heavy burden" of establishing mootness because it was not "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"  *Id.*  The court rejected this argument, stating that although the permits did have expiration dates, it "refuse[d] to speculate that these public bodies will allow the resumption of discharges without a permit."  *Id.* at 1017.

Finally, the plaintiffs argued that claims for civil penalties cannot be mooted because "'penalties punish a polluter for violating the law.'"  *Id.*  In response to that argument, the court opined:

> The Clean Water Act provides that, "[i]n determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d).

---

[23] In a footnote, *Mississippi River Revival* concluded that *Laidlaw* equated "citizen suit claims for civil penalties and claims for injunctive relief for mootness purposes" and had overruled prior decisions to the contrary "at least in part." 319 F.3d at 1016 n.3.

The Cities complied with their storm water permit obligations by timely filing permit applications. The MPCA caused the violations alleged by plaintiffs when it failed to act on the permit applications. Assuming without deciding that the Cities were then in technical violation of § 1342(p), the appropriateness of assessing civil penalties under § 1319(d) is far different here than in cases that have considered whether industrial or commercial point source operators should be held absolutely liable for permitting delays attributable to the permitting agency. *Compare Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996), *with Driscoll v. Adams*, 181 F.3d 1285 (11th Cir. 1999), *and Hughey v. JMS Dev. Corp.*, 78 F.3d 1523 (11th Cir. 1996). In those cases, the polluters had the alternative of not discharging until the NPDES permit issued, and they benefitted economically from continuing to discharge without a permit.

*Id.*

### 4. Analysis

This Court easily concludes that IP has met its heavy burden of proving mootness in conjunction with NRCM's claims for injunctive and declaratory relief. The Complaint requests an order mandating that IP "take all actions necessary to comply with the [CWA], *including ceasing all discharges into the Androscoggin River until it obtains a valid NPDES permit*." *Compl.* at 11 (emphasis supplied). Even assuming, *arguendo*, IP's 1985 permit was not valid when the complaint was filed, it is now. MDEP's issuance of a final, enforceable MEPDES permit to IP on September 21, 2005, obviates the need for an injunction requiring IP to cease discharges until a permit has issued.[24]

At oral argument, NRCM pressed its request for injunctive relief, insisting it was not moot despite the issuance of the September 21, 2005 MEPDES permit. Relying on *Atlantic Salmon*, 339 F.3d at 23, NRCM argued that this Court retains the authority to grant injunctive relief even after a permit has issued and become effective. NRCM

---

[24] This Court is aware that MDEP moved to reopen IP's September 21, 2005 MEPDES permit. In the interim, however, the permit remains in effect. *See Def.'s Supp. Rep. in Supp. of Mot. to Dismiss*, att. 1 at 4 (MDEP "does not believe that a stay of any terms within IP's [September 21, 2005] permit is warranted during reconsideration, or pending the outcome of these appeals").

quoted the First Circuit:  "Injunctive remedies for past harm commonly dictate future conduct so as to mitigate past harm.  To say that the injunction looks to the future does not alter the fact that it is rooted in past violations, nor prevent its aims or its effects from being remedial."  *Id.* at 33 (internal citation omitted).

But, this quotation is a response to what the First Circuit described as a "classic *non sequitur*":  to prevent future conduct, an injunction usually acts on conduct, which at the point of its issuance, is past conduct.  Here, the conduct that NRCM complained about – namely the unpermitted discharge of pollutants into the Androscoggin River – was fully rectified upon MDEP's issuance of a final MEDPES permit.  To enjoin IP from discharging until it obtains a permit it has already obtained would be simply nonsensical.

NRCM's reliance on *Atlantic Salmon* is misplaced.  In *Atlantic Salmon*, Judge Carter was faced with salmon farm companies, which at the time the injunction issued, not only did not have a NPDES permit, but had never had one.  *Id.* at 26 ("EPA never issued permits for any of the companies' sites").  After the district court issued its injunction, MDEP issued a MEPDES permit, which was in some respects more lenient than the injunction.  *Id.* at 29-30.  The question then arose as to the continuing vitality of the injunction.  The First Circuit concluded that "the court may grant additional injunctive relief governing the post-permit operations of the companies insofar as the court is remedying harm caused by their past violations."  *Id.* at 31 (emphasis omitted).

But, here, this Court has concluded that IP had a valid NPDES permit before September 21, 2005 and the record confirms it now has a valid MEPDES permit.  Even if this Court has the theoretical authority to issue an injunction establishing stricter conditions than the MEPDES permit allows, it has no basis for doing so.  NRCM's

Complaint states and restates that it is seeking an injunction to prohibit discharges "until [IP] obtains a valid NPDES permit." *Compl.* ¶ 4 & pg. 11. Following the issuance of the permit, NRCM has not moved to amend its Complaint to state a claim for alternative relief in view of the newly issued permit. As such, there are no allegations in the Complaint that provide a basis, even when viewed in a light most favorable to NRCM, for granting the relief NRCM sought for the first time at oral argument.

Regarding civil penalties, the weight of authority is, particularly post-*Laidlaw*, that a defendant's post-complaint compliance with the CWA will not necessarily moot a citizen-plaintiff's claim for civil penalties. This Court cannot agree with *Mississippi River Revival*'s conclusion that *Laidlaw* equates injunctive relief and civil penalties. To the contrary, *Laidlaw* distinguished between injunctive relief and civil penalties: "Under § 1365(a), the district court has discretion to determine which form of relief is best suited, in the particular case, to abate current violations and deter future ones." 528 U.S. at 192. *Laidlaw* noted that injunctive relief can be "an excessively intrusive remedy" and "could entail continuing superintendence of the permit holder's activities by a federal court." *Id.* at 193. *Laidlaw* upheld the district court's imposition of a substantial civil fine, despite its denial of injunctive relief. *Id.*

At this stage and on this motion, this Court declines to render moot NRCM's claim for civil penalties. The critical question under *Laidlaw* is whether IP's conduct justifies the imposition of civil penalties to deter future conduct. As *Mississippi River Revival* suggests, if the failure to issue a timely permit were caused solely by the agency, not the defendant, it seems inappropriate to create a modern day whipping boy, here punishing IP for the inaction of government. 319 F.3d at 1016-17. But, it is also true that

*Mississippi River Revival* distinguished between the municipal defendants in that case and a case, as here, involving an industrial point source operator, at least theoretically capable of "not discharging until the NPDES permit issued." *Id.* at 1017. At this early stage, without any further information, this Court cannot assess whether IP deserves deterrence and whether and how to apply the factors set forth in 33 U.S.C. § 1319(d).

### E.  Effect of Delegation of NPDES Permitting Authority to MDEP

This leads finally to the heart of the matter:  whether delegation of NPDES permitting authority from EPA to MDEP in January 2001 broke the chain of administrative extensions of IP's 1985 NPDES permit. *See Compl.* ¶¶ 28-29 & att. 1; *Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss* at 15-17.  Specifically, NRCM contends that under 40 C.F.R. § 122.6(d)(1), EPA-issued permits may be continued in force after delegation only if permitted by state law, and because Maine law does not authorize MDEP to extend the terms of an EPA-issued permit, IP has been operating without a NPDES permit since January 12, 2001 – the date of delegation.

The EPA promulgated a regulation to address what happens if, while awaiting action from EPA on a new application for a permit, the old permit expires. *See* 40 C.F.R. § 122.6.  This regulation expressly allows the conditions of an expired permit to continue in force "until the effective date of the new permit" if the permittee has submitted a timely application for a new permit and the EPA "through no fault of the permittee does not issue a new permit . . . on or before the expiration date of the previous permit." *Id.* § 122.6(a)(1), (2).  Permits continued under this section "remain fully effective and enforceable." *Id.* § 122.6(b). *See United States v. Zenon-Encarnacion*, 387 F.3d 60, 63 (1st Cir. 2004) ("The EPA deemed the application complete but failed to act on it.  Under

33

the applicable regulation, this failure meant that the 1984 permit 'continued in force' despite its expiration." (citing 40 C.F.R. § 122.6(a))).

The background for this regulation is illuminated in *Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156 (D.C. Cir. 1988).  As of 1988, the EPA estimated there were more than 60,000 unprocessed renewal applications for NPDES permits.[25]  *Id.* at 211. The District of Columbia Circuit Court of Appeals observed that "[a]bsent some mechanism for continuance, each source owner operating under an expired permit would be in violation of the Act and subject to enforcement actions and penalties."  *Id.* (citing 33 U.S.C. §§ 1319, 1365).  The regulation was promulgated to avoid the "risk that such delays might halt the operations of innocent permittees in violation of Congress's intention . . . ."  *Id.*  *Natural Resources* also explained the congressional intent behind the program under which the states assumed responsibility for permitting under the CWA: Congress desired to "'recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and to eliminate pollution.'"  *Id.* at 172-73 (quoting 33 U.S.C. § 1251(b)).

The regulation specifies what happens while a state is transitioning into the permitting agency:

> (d) State continuation.  (1) An EPA-issued permit does not continue in force beyond its expiration date under Federal law if at that time a State is the permitting authority.  States authorized to administer the NPDES program may continue either EPA or State-issued permits until the effective date of the new permits, if State law allows.  Otherwise, the facility or activity is operating without a permit from the time of expiration of the old permit to the effective date of the State-issued new permit.

40 C.F.R. § 122.6(d).

---

[25] In *Atlantic Salmon*, the First Circuit, using a generous phrase, described EPA's delayed response to a permit application as "a leisurely process of consultation."  339 F.3d at 26.

Highlighting the phrase, "if State law allows," IP argues that Maine law authorizes continuation of expired EPA-issued NPDES permits if a timely and complete renewal application is filed. *See Def.'s Mot. to Dismiss* at 13 n.14 (citing 06-096 CMR, ch. 2 § 21(A)). Because it filed a timely renewal application in connection with its 1985 permit, IP contends that this provision of Maine law continued its permit in force until MDEP issued a new permit on September 21, 2005. This argument is incorrect.

The state regulation cited by IP is 06-096 CMR, ch. 2 § 21(A), *available at* http://www.maine.gov/sos/cec/rules/06/096/096c002.doc, one of the regulations governing the affairs of MDEP. It states, in pertinent part:

> If [a] renewal application is timely submitted prior to the expiration of the license and accepted as complete in accordance with section 11(B) of this rule, the terms and conditions of the existing license remain in effect until the final Department decision on the renewal application becomes effective.

The term "license" as used in 06-096 CMR, ch. 2 § 21(A) "means any license, license amendment, license renewal, transfer, permit, variance, approval or certification *issued by the Department*." *Id.* § 1(J) (emphasis supplied). The term, "Department," is defined as "the Department of Environmental Protection, including the Board and the Commissioner." *Id.* § 1(G). A permit issued by EPA is not a permit "issued by the Department"; Maine law does not provide for automatic continuation of EPA-issued NPDES permits under 40 C.F.R. § 122.6(d)(1).

This does not end the inquiry. This Court must look to the language of 40 C.F.R. § 122.6(d)(1) to determine whether it applies to IP's 1985 permit:

> An EPA-issued [NPDES] permit does not continue in force beyond its expiration date under Federal law *if at that time a State is the permitting authority*.

40 C.F.R. § 122.6(d)(1) (emphasis supplied).  The plain meaning of the first sentence of 40 C.F.R. § 122.6(d)(1), as IP points out, can be interpreted in just one way – the regulation applies only to NPDES permits that expire *after* EPA has transferred NPDES permitting authority to the state.  *See Roberts v. Gonzales*, 422 F.3d 33, 36-37 (1st Cir. 2005) (looking to the "plain meaning" of the regulation at issue).  Said another way, 40 C.F.R. § 122.6(d)(1) is inapplicable to EPA-issued NPDES permits that expired before delegation, but have been continued under federal law by virtue of 40 C.F.R. § 122.6(a).[26]

NRCM argues that to construe the regulation to apply to permits that expire after delegation, but to exempt those that expired before delegation would lead to an "absurd" outcome; namely, the longer the polluter has polluted the less regulation applies.  *Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss* at 16-17.  This, NRCM asserts, "is not, and cannot be, the law." *Id.* at 17.  Although such a result may be counterintuitive, it would not be irrational.  As *Natural Resources* explained, Congress wished to avoid "halting the operations of innocent permittees" from the consequences of governmental inaction and at the same time wished to transfer primary regulatory responsibility to the states.  859

---

[26]       40 C.F.R. § 122.6(a) states:
(a)  EPA permits.  When EPA is the permit-issuing authority, the conditions of an expired permit continue in force under 5 U.S.C. § 558(c) until the effective date of a new permit . . . if:
(1)  The permittee has submitted a timely application . . . which is a complete . . . application for a new permit; and
(2)  The Regional Administrator, through no fault of the permittee does not issue a new permit with an effective date . . . on or before the expiration date of the previous permit . . . .

In *Student Pub. Interest Research Group of N.J., Inc. v. Georgia-Pacific Corp.*, 615 F. Supp. 1419 (D.N.J. 1985), Judge Brotman referred in passing to a similar situation.  Georgia-Pacific obtained an EPA discharge permit on July 31, 1974, which expired on July 31, 1979. *Id.* at 1421 & n.1.  In April, 1982, EPA delegated to the states the authority to issue water pollution discharge permits pursuant to the CWA and the New Jersey Department of Environmental Protection discharge permit went into effect on February 1, 1984. *Id.* at 1421.  Citing 40 C.F.R. § 122.6, Judge Brotman commented that the "EPA permit expired on July 31, 1979 but remained in effect by operation of law" and "continued to apply" until the state permit's effective date. *Id.* at 1421 n.1.

F.2d at 172-73, 211.  To maintain the status quo for permittees whose EPA permits have expired prior to state delegation and continue them in force by operation of regulation, but to require permittees whose permits expire after delegation to comply with state procedure would be consistent with congressional intent.  That the last shall be first is, after all, not an unknown or inherently irrational concept.

Here, IP has been discharging pollutants into the Androscoggin River under the terms of its 1985 NPDES permit and it timely applied for a renewal prior to the permit's expiration.  On July 14, 2000, EPA notified IP by letter that its 1992 NPDES permit was withdrawn and that IP was and would continue to be subject to the terms of its 1985 permit until EPA or MDEP acted upon IP's 1986 renewal application.  Pursuant to the plain meaning of § 122.6(d)(1), the regulation did not invalidate IP's 1985 NPDES permit upon delegation because the permit had expired before the delegation. Accordingly, IP's 1985 NPDES permit remained effective under 40 C.F.R. § 122.6(a) until MDEP's issuance of a new MEPDES permit on September 21, 2005.

## IV.  CONCLUSION

This Court GRANTS IP's Motion to Dismiss the Complaint (Docket No. 9).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE


Dated this 28th day of March, 2006